IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>vs.<br><br>$1,638,055.00 UNITED STATES CURRENCY,<br><br>                Defendant. | Civil No. 8:21CV321<br><br>**COMPLAINT FOR FORFEITURE *IN REM*** |

The United States of America, for its cause of action against the defendant property, pursuant to Rule G(2) of the Supplemental Rules for Admiralty and Maritime Claims and Asset Forfeiture Actions, states and alleges as follows:

### Nature of the Action

1. This is an action to forfeit property to the United States for violations of 21 U.S.C. § 881.

### The Defendant *in rem*

2. Defendant property consists of $1,638,055.00 in United States currency seized from a rented black BMW on February 2, 2021, during a traffic stop on westbound Interstate 80 near mile marker 377 in Nebraska. The lone occupant was the driver, Taysir Yasin.

3. The U.S. Customs and Border Protection (CBP) currently has custody of the defendant property.

### Jurisdiction and Venue

4. This Court has subject matter jurisdiction for an action commenced by the United States pursuant to 28 U.S.C. § 1345, and for an action for forfeiture pursuant to 28 U.S.C. § 1355(a). This Court also has jurisdiction over this particular action pursuant to 21 U.S.C. § 881.

5. This Court has *in rem* jurisdiction over the defendant property pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to the forfeiture occurred in this district.

6. Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to the forfeiture occurred in the District of Nebraska.

## Basis for the Forfeiture

7. Defendant property is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) because it constitutes 1) money, negotiable instruments, securities and other things of value furnished or intended to be furnished in exchange for a controlled substance in violation of the Controlled Substances Act, 2) proceeds traceable to such an exchange, and/or 3) money, negotiable instruments and securities used and intended to be used to facilitate a violation of the Controlled Substances Act.

## Facts

8. On February 2, 2021, York County Sheriff's Deputy Korey Goplin (hereinafter "Dep. Goplin") was on patrol in Seward County as part of the Seward County/York County Criminal Interdiction Task Force.

9. While on patrol on Interstate 80 at approximately 10:00 a.m., Dep. Goplin observed a black BMW (hereinafter "BMW") bearing Ohio license plate HXH8714 traveling westbound near mile marker 379 following too close to a semitrailer truck, in violation of Nebraska traffic laws.

10. In particular, Dep. Goplin observed the BMW traveling less than one second behind the semitrailer truck.

11. Dep. Goplin followed the BMW as it continued to drive too close to the semitrailer truck.

12. Shortly thereafter, Dep. Goplin initiated a traffic stop of the BMW near mile marker 377 on Interstate 80.

13. Dep. Goplin made contact with the driver and lone occupant of the BMW, Taysir Yasin (hereinafter "Yasin").

14. Upon approaching the vehicle, Dep. Goplin observed a blanket laying on the back seat of the vehicle, a rubber band in the cupholder, and on the passenger seat was a small travel bag with miscellaneous snacks.

15. Dep. Goplin noticed an overwhelming odor of air freshener emanating from inside the vehicle.

16. Dep. Goplin advised Yasin regarding the reason for the stop.

17. Yasin acknowledged to Dep. Goplin that he was driving close behind the semitrailer truck.

18. Yasin explained to Dep. Goplin that he drove close behind the semitrailer truck because a vehicle wanted to pass him and therefore he switched lanes and drove closely behind the semitrailer truck to make room for the passing vehicle.

19. Dep. Goplin explained to Yasin that he needed to give more distance when following vehicles especially considering the dense fog in the area that day.

20. Dep. Goplin asked Yasin for his license, registration and insurance.

21. Yasin provided his Illinois driver's license that showed his identifying information as: Taysir Yasin. DOB: 1/20/19XX.

22. Dep. Goplin observed a large amount of cash in Yasin's pocket.

23. Yasin advised Dep. Goplin that the vehicle was a rental vehicle.

24. Based on his training and experience as a law enforcement officer, Dep. Goplin knew that BMWs are upgraded rental vehicles.

25. Dep. Goplin asked Yasin if he had the rental agreement. Yasin stated he had received an email with the rental information on his phone. Yasin attempted to locate the rental agreement in his email on his phone.

26. During this contact, Yasin provided Dep. Goplin his phone with an email on it to view. Dep. Goplin reviewed the email and concluded it did not have any relevance to the BMW.

27. Yasin was unable to provide Dep. Goplin with the registration or rental agreement for the BMW.

28. Dep. Goplin asked Yasin to bring his phone back to his patrol vehicle to look for the rental agreement while Dep. Goplin issued Yasin a warning for the violation. Yasin agreed to this request.

29. In his patrol car, Dep. Goplin talked with Yasin as he ran his records check.

30. Yasin informed Dep. Goplin that he was a restaurant owner in Illinois.

31. Yasin further advised that his restaurant business was not doing well due to COVID-19.

32. Yasin told Dep. Goplin that he was traveling from Chicago to Los Angeles to visit his brother, who he claimed lived in Los Angeles.

33. Yasin advised his brother worked as a hair stylist in Los Angeles.

34. During the traffic stop, Dep. Goplin learned that Yasin's brother did not live in Los Angeles but rather lived in Illinois.

35. Yasin advised he left Chicago at 1:00 a.m. and rested at a rest area during the trip.

36. Based on his training and experience, Dep. Goplin knows that those involved in trafficking illegal items cross-country will often sleep in their vehicles for short periods of time instead of stopping at hotels in order to limit their chances of law enforcement contact.

37. Yasin stated he was going to be in California for only three days.

38. Based on his training and experience, Dep. Goplin knew that it took approximately 30 hours to drive from Illinois to Los Angeles.

39. Dep. Goplin believed driving 30 hours for a three-day trip in California was an illogical travel itinerary.

40. Yasin's previous vehicle rental records indicated that he also rented a vehicle for a one-way trip from Chicago to Medford, Oregon, in November 2020.

41. Based on his training and experience, Dep. Goplin knows Medford is a destination for those involved in trafficking contraband, specifically marijuana.

42. Over the course of the stop, Dep. Goplin observed Yasin avoid eye contact with him during their interactions.

43. Based on his training and experience, Dep. Goplin believed that multiple circumstances of Yasin's trip were indicative of criminal activity, to include bulk cash smuggling, when taken as a totality during the scope of the stop. This includes, but is not limited to, the following:

- Upgraded rental vehicle
- Lack of eye contact
- Quick turn-around trip
- Departed for trip at 1:00 a.m.
- Sleeping in rest areas during the trip
- Previous one-way rental from Chicago to Medford, Oregon
- Origin and destination of the trip
- Rubber band in the vehicle's cupholder

- Large amount of currency in the driver's pocket
- Discrepancies in travel itinerary whereby Yasin claimed to be visiting a brother in Los Angeles that did not actually live there
- Cost-effectiveness of the trip
- Illogical travel itinerary

44. Dep. Goplin returned Yasin's documents back to him.

45. Dep. Goplin asked Yasin separately if he had marijuana, methamphetamine, cocaine, heroin, or large amounts of U.S. currency in the BMW. Yasin denied having any of those items in his BMW.

46. Dep. Goplin reported that, while Yasin denied having any of those items, his response to the question about large amounts of U.S. currency was different than the other responses.

47. Yasin granted Dep. Goplin consent to search the BMW.

48. During the search, Dep. Goplin noted a large, very heavy, locked purple suitcase in the trunk.

49. Yasin granted Dep. Goplin consent to search the locked suitcase.

50. However, Yasin claimed he could not find the key.

51. Yasin assisted law enforcement while they searched for the key.

52. Later, law enforcement found the key in a travel bag on the front seat of the BMW.

53. Dep. Goplin noted that during the search, Yasin would have picked up the key multiple times and moved it around in the bag during the search but did not bring the key to law enforcement's attention.

54. Dep. Goplin searched what appeared to be a personal bag in the trunk of the vehicle, which contained a key fob for a Bentley automobile.

6

55. Based on his training and experience, Dep. Goplin found it unusual that Yasin had the keys to an expensive luxury vehicle after claiming that his business was struggling due to COVID-19.

56. Dep. Goplin also located two FedEx boxes in the trunk—a smaller box and a larger box.

57. Yasin granted Dep. Goplin consent to search the FedEx boxes.

58. Upon opening the smaller FedEx box, Dep. Goplin found that it contained rubber-banded stacks of U.S. currency later determined to total $140,000.00.

59. Dep. Goplin opened the suitcase. Inside, he found multiple rubber-banded stacks of U.S. currency later determined to total $929,175.00.

60. Dep. Goplin observed multiple scented dryer sheets inside the suitcase.

61. Based on Dep. Goplin's training and experience, individuals trafficking in drug proceeds often use scented dryer sheets in an attempt to mask the odor of drugs on the currency.

62. Dep. Goplin contacted his supervisory officer, Seward County Sheriff Mike Vance, who determined the vehicle would be towed to the police office to allow for a more thorough search.

63. Dep. Goplin opened the second, larger FedEx box from the trunk and found that it contained $568,880.00 in U.S. currency.

64. After an initial count, the currency found in the vehicle reportedly totaled $1,638,075.00.

65. A subsequent count determined that the total was actually $1,638,055.00.

66. Dep. Goplin observed that the currency was rubber-banded and not "faced" (i.e., all the bills face up and facing the same direction), which, based on his training and experience, indicated that it had not recently been withdrawn from a bank.

67. The majority of the seized currency was in $20 bills.

68. Based on his training and experience, Dep. Goplin, knew $20 bills to be the most common denomination for drug transactions.

69. Dep. Goplin observed that the currency had a strong odor of marijuana emitting from it.

70. Dep. Goplin further observed marijuana remnants falling off the currency as law enforcement counted the currency.

71. Law enforcement conducted a chemical kit test on the currency.

72. This test confirmed the presence of marijuana.

73. Law enforcement also conducted a discretionary sniff of the suitcase using a certified Nebraska drug detection canine.

74. The canine alerted to the suitcase indicating the odor of drugs was detected.

75. Yasin did not cooperate with the investigation and did not provide a reasonable, consistent explanation for the currency in his vehicle.

76. Yasin initially stated the money was for purchasing a business and at another time stated that it was for buying cars.

77. Homeland Security Investigations (hereinafter "HSI") Omaha special agents responded and attempted to interview Yasin, but he invoked his right to counsel and the interview ceased.

78. Law enforcement turned over the seized currency to HSI for forfeiture.

79. HSI deposited the seized currency into a government bank account, but $5,000.00 of the seized currency continues to be held in cash by CBP for potential evidentiary purposes.

80. Law enforcement also seized a cellular phone from Yasin.

81. On February 5, 2021, law enforcement subpoenaed Enterprise rental car for Yasin's contract on the 2020 BMW driven during the incident.

82. On February 9, 2021, Enterprise complied with the subpoena and supplied the rental contract to law enforcement.

83. The contract indicated that Yasin rented the BMW on February 1, 2021, at 7:15 p.m.

84. The BMW was a one-way rental from Midway International airport in Chicago, Illinois to Los Angeles International Airport in Los Angeles, California.

85. The BMW was due back in Los Angeles on February 3, 2021, by 5:30 p.m.

86. Dep. Goplin noted that if Yasin had driven the remaining 22 hours from Seward County, Nebraska to Los Angeles without rest, then Yasin would have spent less than 8 hours in his destination before returning the rental car.

**Claim for Relief**

WHEREFORE the United States of America prays the defendant property be proceeded against for forfeiture in accordance with the laws, regulations and rules of this Court; that due notice be given to all interested parties to appear and show cause why forfeiture should not be decreed; that the defendant property be condemned, as forfeited, to the United States of America and disposed of according to law and regulations; that the costs of this action be assessed against the defendant property; and for such other and further relief as this Court may deem just and equitable.

          UNITED STATES OF AMERICA,
          Plaintiff

          JAN W. SHARP
          Acting United States Attorney

        By:    s/ Mikala Purdy-Steenholdt
MIKALA PURDY-STEENHOLDT (NY#5112289)
Assistant U.S. Attorney
1620 Dodge Street, Suite 1400
Omaha, NE  68102-1506
Tel:  (402) 661-3700
Fax:  (402) 345-5724
E-mail: Mikala.Purdy-Steenholdt@usdoj.gov

## VERIFICATION

I, Evan Mason, hereby verify and declare under penalty of perjury that I am a Special Agent with Homeland Security Investigations (HSI) that I have read the foregoing Verified Complaint *in rem* and know the contents thereof, and that the factual matters contained in paragraphs 8 through 86 of the Complaint are true to my own knowledge, except that those matters herein stated to be alleged on information and belief and as to those matters I believe them to be true.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, as well as my investigation of this case, together with others, as a Special Agent with HSI.

I hereby verify and declare under penalty of perjury that the foregoing is true and correct.

Dated: August 24, 2021

Evan Mason,
Special Agent
Homeland Security Investigations